IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LEANDRO AMPUDIA ROVIROSA,          §
                                   §
        Petitioner,                §
                                   §
v.                                 §   Civil Action No. H-12-1414
                                   §
MICHELLE VIETH PAETAU,             §
                                   §
        Respondent.                §

## MEMORANDUM OPINION AND ORDER

Petitioner, Leandro Ampudia Rovirosa ("Ampudia"), brought this action[1] against Respondent, Michelle Vieth Paetau ("Vieth") pursuant to the Hague Convention on the Civil Aspects of Child Abduction Remedies Act [hereinafter "Hague Convention"], 42 U.S.C. §§ 11601-11611, seeking the return of his son, L.A.V., and daughter, M.A.V., to Mexico from the United States.  The case was tried to the court on December 3, 4, and 5, 2012.  The court has considered all of the evidence and the arguments of the parties, and, pursuant to Federal Rule of Civil Procedure 52, will enter judgment in accordance with the findings of fact and conclusions of law in this memorandum opinion.

The court makes the following findings of fact and conclusions of law.  In making these findings, the court has reviewed the evidence and the admissible testimony and has assessed the credibility of the witnesses.  Any finding of fact that should be

_____

[1]     The parties consented to proceed before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  See Docs. 36, 37 and 38.

construed as a conclusion of law is hereby adopted as such.  Any conclusion of law that should be considered as a finding of fact is hereby adopted as such.

**<u>Findings of Fact</u>**

1.   Ampudia and Vieth are the natural parents of L.A.V. and M.A.V. (also referred to as "the children").   Ampudia and Vieth are both citizens of Mexico.  Vieth has had permanent resident alien status in the United States since 1980.

2.   L.A.V. was born in August 2005 in Mexico City and is presently seven years of age.  L.A.V. has permanent resident alien status in the United States based on Vieth's U.S. immigration status.   L.A.V. has a U.S. social security number and a Texas identification card.

3.   M.A.V. was born in June 2007 in Mexico City and is presently five years of age.  M.A.V. has permanent resident alien status in the United States based on Vieth's U.S. immigration status.   M.A.V. has a U.S. social security number and a Texas identification card.

4.   Both L.A.V. and M.A.V. possess only Mexican passports.

5.   Ampudia was aware of, and consented to, Vieth's obtaining U.S. permanent resident status for the children.

6.   Ampudia and Vieth lived with their children in a rented home on Contreras Street in Mexico City beginning in 2009.  The children attended the Alexander Bain Institute in 2009, 2010, and

2

a portion of 2011.  They were driven to this school by a chauffeur employed by Ampudia's employer.

7.  From May 10, 2010, to June 11, 2010, Ampudia received voluntary inpatient treatment for a gambling addiction.  Ampudia testified that he no longer gambles as a result of this treatment. Vieth testified that she believed Ampudia continued to gamble after he was released from inpatient treatment based on her observations of emails to his gambling associates and his body language when he was on certain telephone calls.  This factual dispute is not material to the court's determination.

8.  Ampudia testified that his gambling debts have been paid and cited Petitioner's Exhibit 11 as evidence that he owes no further debts.  That exhibit shows that the listed debts were discharged between July 2010 and February 2012.  Vieth testified that she saw evidence that Ampudia owed gambling debts in excess of $1,000,000 [U.S.] and remains unsure if all debts have been paid. Whether Ampudia has actually satisfied the entirety of his gambling debts is not material to the court's determination.

9.  After Ampudia's release from the rehabilitation facility, the relationship between the parties deteriorated, and they began to discuss a separation.

10.  Javier Olea ("Olea"), a family friend, testified that he attempted to negotiate a resolution of the parties' pending separation in the November-December 2010 time frame.  Those

3

discussions centered around child support, rent, school tuition and visitation and assumed that the children would continue to reside in Mexico.  According to Olea, Vieth never told him that she was concerned that the children were in danger in Mexico.

11.   In late 2010, John Blomfield ("Blomfield"), a mutual friend, attempted to negotiate a settlement between Ampudia and Vieth to resolve the couple's financial and child custody issues. He also offered to open his home in Houston, Texas, to both parties and their children so they could relocate and make a fresh start. Vieth accepted the offer, and, according to Vieth and Blomfield, Ampudia told Blomfield that he would consider it. Vieth testified that Ampudia knew she was moving to Houston with the children because they had discussed it.  In preparation for their move, Blomfield made renovations to several rooms in his home.  Vieth and Ampudia decided to separate.

12.   On December 18, 2010, Vieth and the children went to Acapulco to visit her family for the Christmas holidays.  Vieth, assisted by her friend, Celia Tello ("Tello"), packed up clothing and toys at the Contreras Street residence in preparation for her move to Houston.  Vieth and her children drove with Tello and Tello's family to Acapulco with the clothing and toys.  Vieth and the children flew from Acapulco to Houston, Texas, on December 26, 2010, and lived with Blomfield and his family until January 14, 2011.

4

13.    Between late December 2010 and early January 2011, Ampudia moved into an apartment approximately twenty minutes away from the Contreras Street residence.  Ampudia testified that he believed Vieth was taking the children to the United States to visit her mother in Chicago, but learned that they went to Houston instead.  Common sense dictates that Ampudia was aware that Vieth and his children had stayed with Blomfield when in Houston after the Christmas holidays.

14.  Vieth and the children returned to Mexico City on January 14, 2011.  Vieth testified that although she considered Blomfield's home in Houston to be her and the children's permanent residence by that time, she returned to Mexico City to straighten out her and Ampudia's finances.  According to Vieth, the rent on the Contreras Street residence was months in arrears and the utilities were also past due.  She attributed the fault of the non-payments to Ampudia.

15.  In February 2010, Vieth moved into Tello's residence, where Vieth and her children shared a bedroom vacated by Tello's two-year-old daughter.  Tello confirmed this, testifying that she assisted Vieth in moving out of the Contreras Street residence and selling some of her property to obtain needed funds.  Tello averred that Vieth and the children lived with her through May 2011, when Vieth returned to Houston.

16.  Ampudia testified that Vieth and the children continued to reside at the Contreras Street address until June 1, 2011.

17.  On May 3, 2011, Vieth filed a petition in the 27th Family Court, Mexico City, D.F., to terminate Ampudia's parental rights on the ground that he had abandoned the children due to non-support. In the petition, she claimed that she had borrowed in excess of $633,000 pesos to support the children after he failed to do so. She also claimed in the petition that he had borrowed in excess of $7,000,000 pesos from her and owed $10,000,000 pesos in gambling debts.  She sought $176,828 pesos in monthly support.

18.  Significant to the present determination, the Mexican petition claimed expenses for the children's activities in Mexico City during the first quarter of 2011.

19. The petition also avers that Vieth paid rent, maintenance fees and water expenses at the Contreras Street residence through May 2011 by using funds she borrowed from Bobo Outsourcing. Emma Rovirosa testified that she paid these expenses for the same period of time on behalf of her son, Ampudia. The court in Mexico has the documents supporting this claim, and this court makes no determination on the credibility of either witness.

20.  Ampudia's legal expert, David Lopez ("Lopez"), testified that, in his opinion, Ampudia, as the natural father of the children, had a right of custody, known as patria potestad, under Mexican law.  Ampudia and Vieth lived together as a couple and acted as parents to the children.  Cohabitation with a child is a parental right under Mexican law and, even after Ampudia ceased to

6

cohabit with the children, he exercised parental rights by paying for their schooling, visiting the children at school or sporting events and having lunch with them.

21.  Lopez testified that the fact that Vieth filed a lawsuit to terminate Ampudia's parental rights is an admission by Vieth that Ampudia had rights to be terminated.  And, Ampudia's filing a response to Vieth's lawsuit is an assertion of his objection to the termination of his parental rights.  Lopez acknowledged that patria potestad may be lost by a failure to pay child support for more than ninety days, but that determination has not been made by the Mexican court and, until that court determines that Ampudia abandoned the children, Ampudia has the presumption of having custodial rights.  In light of the above, Lopez opined that Ampudia has rights of custody for purposes of the Hague Convention.

22.  In the case at bar, Ampudia testified that, until June 2011, he visited the children once a week, took them to lunch or for ice cream, and attended their school and sporting events.

23.  L.A.V. and M.A.V. attended the Alexander Bain Institute from January 2011 to May 2011.  On May 23, 2011, Vieth committed in writing to pay the past-due tuition at the Alexander Bain Institute for the months of January 2011 to May 2011 by July 4, 2011.  Emma Rovirosa testified that she directed that the past-due tuition be paid on July 5, 2011, and the sum was deducted from Ampudia's salary.

7

24.  On May 20, 2011, M.A.V. and L.A.V. were seen by their pediatrician in Mexico City.

25.  Vieth testified that another reason for her return to Mexico City with the children in January 2011 was to renew the passport of M.A.V., which would expire in April 2011.  Ampudia's signature was required by law to renew the passport, and, according to Vieth, he delayed complying with her requests to renew the passport for months.  Finally, on May 31, 2011, Ampudia and Vieth went to the passport office and signed documents renewing M.A.V.'s passport.  Ampudia, Vieth and the children had lunch at Ampudia's apartment that same day.

26.  Vieth testified that she told Ampudia on May 31, 2011, that she had filed the lawsuit to terminate his parental rights. Vieth conceded that she did not tell Ampudia that she and the children were flying to Houston the following day.

27.  Also, on May 31, 2011, Ampudia applied for a passport for himself, replacing one that had been lost.  Vieth produced this lost passport, along with his U.S. visa, in discovery in this action, leading Ampudia to conclude that Vieth had retained his passport and visa to prevent him from traveling to the United States in pursuit of her and the children.  Vieth denied taking Ampudia's passport but had no credible explanation for its discovery in her possession.

28.  On June 1, 2011, Vieth purchased airline tickets for

herself and the children to travel from Mexico City to Houston, Texas, later that same day.  The children have continuously resided in Houston, Texas, since June 1, 2011.

29.  Ampudia was served with Vieth's lawsuit to terminate his parental rights on June 10, 2011.  He filed his answer and countersuit for visitation rights on June 29, 2011.  That case is being actively litigated in Mexico City.

30.  Ampudia testified that he was unaware of where his children were after June 1, 2011.  Ampudia concluded that Vieth and the children were in the United States because the automatic voice mail message on Vieth's phone was in English.  Ampudia asserted that Vieth never answered his calls or voice mails, and the first time he learned that Vieth and the children were in Houston, Texas, was when Blomfield phoned him on August 18, 2011.  Blomfield averred that while he was certain that Ampudia knew that Blomfield lived in Houston, he could not say that Ampudia knew exactly where he lived.

31.  Contradicting Ampudia's testimony in part, Vieth testified that Ampudia, along with his father and brother, spoke to M.A.V. on her birthday in June 2011 via Vieth's cell phone.

32.  M.A.V. and L.A.V. attended summer camps in Houston, Texas, during the summer of 2011.  M.A.V. and L.A.V. attended The School at St. George Place, a public elementary school in Houston, for the 2011-2012 academic year.

9

33.  Ampudia's parents traveled to Houston, Texas, several times to visit the children.  Their first visit was in September 2011.  Because Vieth had Ampudia's U.S. visa in her possession when she traveled to Houston in June 2011, Ampudia could not travel to the United States until he obtained a replacement visa, which he was not able to do until January 2012.  In April 2012, Ampudia traveled to Houston to see the children.

34.  The children are presently enrolled in The School at St. George Place for the 2012-2013 academic year.  Since October 2012, Vieth has worked in Mexico several days a week.  In her absence, the children are cared for by Blomfield, his wife, and a family member of Vieth.

35.  In support of her claim of abandonment, Vieth testified that eight months passed before Ampudia paid any child support, that he failed to help with the children, failed to take them to school and did not feed or clothe them.  This is a claim reserved for the Mexican court.

36. Vieth testified that she is a public figure in Mexico because of her employment as an actress.  She believes that her children may be kidnapped because of Ampudia's gambling debts.  Vieth also fears that the children may be harmed in an earthquake or fire.  She acknowledged that her fears of kidnapping did not prevent her from returning from Houston with the children in January 2011.  Vieth also conceded that she made several personal

10

appearances at public events with the children but felt safe because of the security provided by the sponsors of the events.

37.   L.A.V.'s passport has been lost or stolen and is presently unaccounted for.

**Conclusions of Law**

1.   In 1988, the United States ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act [hereinafter "ICARA"], 42 U.S.C. §§ 11601-11611. Abbott v. Abbott, __ U.S. __, 130 S.Ct. 1983, 1987 (2010);  Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 342 (5th Cir. 2004). Pursuant to the ICARA, U.S. courts have jurisdiction over abduction claims brought under the Hague Convention, but do not have jurisdiction over the merits of an underlying custody dispute. England v. England, 234 F.3d 268, 271 (5th Cir. 2000); 42 U.S.C. § 11603(a).

2.   Both Mexico and the United States are parties to the Hague Convention.  Hague Conference on Private International Law, Status Table, http://www.hcch.net/index_en.php?act=conventions.status&cid=24 (last visited Dec. 3, 2012) (listing the contracting states to the Hague Convention); see Saldivar v. Rodela, __ F. Supp. 2d __, 2012 WL 2914833, at *18 n.5 (W.D. Tex. June 22, 2012).

3.   An individual seeking a child's return under the Hague Convention may commence a civil action by filing a petition in a court "authorized to exercise jurisdiction in the place where the

11

child is located at the time the petition is filed." 42 U.S.C. § 11603(b).

4. Under Article 12 of the Hague Convention, courts in contracting states must return a child who has been "wrongfully removed or retained" to his or her country of habitual residence unless the action was commenced more than one year after the removal and the child has settled in the new location. See 42 U.S.C. § 11601(a)(4). Article 3 of the Hague Convention establishes that a parent's removal or retention of a child is wrongful when the child has been removed or retained outside the child's country of habitual residence, the removal breaches the non-removing parent's custody rights under the laws of the country from which the child was removed, and, at the time of the child's removal, the non-removing parent was exercising those custody rights. Larbie v. Larbie, 690 F.3d 295, 307 (5th Cir. 2012).

5. The non-removing parent must show by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1)(A). Specifically, Ampudia must show that:

> (1) Vieth removed or retained the minor children somewhere other than the children's habitual residence;
> (2) the removal of the minor children violated Ampudia's "rights of custody" under the laws of Mexico; and
> (3) Ampudia was actually exercising his rights of custody when the minor children were removed from Mexico.

Hague Convention, arts. 3, 4; see Larbie, 690 F.3d at 307.

6. Rights of custody, as distinguished from rights of access, include, but are not limited to, "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5.

7. A child's habitual residence for purposes of the Hague Convention "begins with the parents' shared intent or settled purpose regarding their child's residence." Larbie, 690 F.3d at 310 (quoting Nicolson v. Pappalardo, 605 F.3d 100, 104 & n.2 (1st Cir. 2010)). Although the experiences of the child are considered, greater weight is given to the intentions of the parents relative to the child's age. Id. at 310. Where a child's age precludes him or her from deciding the issue of residency, the parents' intentions should be dispositive. Id. In the absence of a shared intent between the parents for the child to abandon the habitual residence, a child's habitual residence "should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." Id. at 311 (quoting Mozes v. Mozes, 239 F.3d 1067, 1082 (9th Cir. 2002)).

8. If the non-removing parent proves his case, the wrongfully removed child must be returned to his or her habitual residence unless the parent opposing the return of the child can show that any of the narrow statutory exceptions to the return apply. See Hague Convention, arts. 12, 13, 20; see also 42 U.S.C. § 11603(e)(2). A court is not bound to order the return of the child

13

if the removing parent establishes, by a preponderance of the evidence, that the non-removing parent was not exercising his custody rights at the time of the child's removal or had consented or later acquiesced to the removal of the child, or that the child is of a sufficient age and maturity to decide that he or she does not want to return to the habitual residence.  Hague Convention, art. 13(a); 42 U.S.C. § 11603(e)(2)(B); see Sealed Appellant, 394 F.3d at 343.

9.   Under Article 13(b) of the Hague Convention, a court may decline to return the child to the habitual residence if the removing parent establishes, by clear and convincing evidence, that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."   See 42 U.S.C. § 11603(e)(2)(A).  The removing parent may also prevent the child's return if she can show, by clear and convincing evidence, that U.S. principles "relating to the protection of human rights and fundamental freedoms" do not permit the return of the child to his or her habitual residence.  Hague Convention, art. 20; see 42 U.S.C. 11603(e)(2)(A); Sealed Appellant, 394 F.3d at 343.

10.   Ampudia has established by a preponderance of the evidence that, under the laws of Mexico, he has rights of custody over L.A.V. and M.A.V.

11.   Ampudia has established by a preponderance of the

14

evidence that he was exercising his rights of custody over L.A.V. and M.A.V. at the time of the children's removal from Mexico by Vieth.

12.    Ampudia has established by a preponderance of the evidence that Mexico was L.A.V.'s and M.A.V.'s habitual residence before their removal from Mexico by Vieth.

13.    Ampudia has established by a preponderance of the evidence that Vieth wrongfully removed L.A.V. and M.A.V. from their habitual residence in Mexico in violation of Ampudia's rights of custody over the children.

14.    The "settled" defense contained in Article 12 of the Hague Convention does not apply to this case because Ampudia commenced these proceedings within one year after L.A.V.'s and M.A.V.'s removal from Mexico, which occurred on June 1, 2011.

15.    The "age and maturity" exception contained in Article 13(a) of the Hague Convention does not apply to the facts of the case because L.A.V. and M.A.V. are not of a sufficient age and maturity for the court to afford much weight to their preference.

16.    The "grave risk" exception articulated in Article 13(b) of the Hague Convention does not apply because Vieth has failed to show by clear and convincing evidence that returning L.A.V. and M.A.V. to Mexico would present a grave risk of physical or psychological harm to the children or would otherwise place them in an intolerable position.

17.    The "human rights and fundamental freedoms" exception contained in Article 20 of the Hague Convention does not apply because there is no clear and convincing evidence that returning L.A.V. and M.A.V. to Mexico would oppose principles relating to the protection of human rights and fundamental freedoms.

18.    Given that Ampudia has established by a preponderance of the evidence each of the elements required by the Hague Convention to show that Vieth wrongfully removed L.A.V. and M.A.V. from Mexico, and given that Vieth has failed to meet her burden that any of the exceptions apply to the facts of this case, the court must order the return of L.A.V. and M.A.V. to Mexico, their habitual residence prior to their wrongful removal by Vieth.

19.    To the extent Ampudia and Vieth have any disputes regarding custody of the children, those disputes must be resolved by the courts in Mexico.

**SIGNED** at Houston, Texas, on this 6ʰ day of December, 2012.

_____
NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE